## Joseph Sackheim v. Harris Miller.

1. REMITTITUR—*when does not cure excessiveness of verdict.*  A
*remittitur* does not cure a verdict which is apparently the result of
prejudice, passion or misconception.

2. ALIENATION OF AFFECTIONS—*what evidence tends to establish.*
In an action for damages by a husband against a third party alleg-
ing alienation of affections, a decree of divorce granted at the in-
stance of the wife tends to show that the affections of the wife
were alienated by the plaintiff's own conduct.

3. ARGUMENT OF COUNSEL—*when impropriety of, not subject to
review.*  The impropriety of the remarks of counsel in argument are
not subject to review where such remarks were not objected to in
the trial court.

Action for damages for alienation of affections.   Error to the
Superior Court of Cook County; the Hon. ROBERT W. WRIGHT,
Judge, presiding.   Heard in this court at the March term, 1907.
Reversed and remanded.   Opinion filed October 3, 1907.

Sackheim v. Miller.

GOLDZIER, RODGERS & FROEHLICH, for plaintiff in error.

SHAEFFER & SHAEFFER, for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

Defendant in error commenced suit against plaintiff in error, May 7, 1904, and, November 14, 1904, filed a declaration in substance as follows:

"For that whereas the defendant, contriving and wickedly intending to injure the plaintiff and to deprive him of the society and assistance of Becky Miller, the wife of the plaintiff, to alienate and destroy her affection for the plaintiff and to disturb and break up the home and conjugal happiness of the plaintiff, did, on the ———— day of April, A. D. 1904, and on divers other days between that date and the commencement of this suit, during the absence of the plaintiff, and without his knowledge and consent, clandestinely and secretly seek the society of the said Becky Miller, then and there and still being the wife of the plaintiff, and the defendant at the time aforesaid, to-wit, on the ———— day of April, 1904, and on divers other days between that date and the commencement of this suit, was purposely and almost continuously in the company of the said Becky Miller and professed affection for her and made love to her and wrongfully sought and obtained her confidence and love and wickedly advised, persuaded and induced the said Becky Miller to separate from and abandon her husband, the plaintiff herein, and to collect and receive and appropriate to her own use all the money and property of the plaintiff, and to make false and fictitious charges against the plaintiff and sue him upon said false and fictitious charges for divorce and alimony; and thereby the love and affection of said Becky Miller for the plaintiff was then and there alienated and destroyed; and also by means of the premises the plaintiff has from thence hitherto wholly lost and been deprived of the society and assistance of said Becky Miller, his said wife, in his domestic affairs, which the plaintiff during all that time ought to have and otherwise might and would have had.

"To the damage of the plaintiff of twenty-five thousand dollars, and therefore he brings his suit, etc."

The defendant (plaintiff in error here) pleaded not guilty, and such proceedings were had that the jury found him guilty and assessed plaintiff's damages at the sum of $6,000. The defendant moved for a new trial, when the court told the plaintiff that unless he would remit $4,000 from the verdict a new trial would be granted, whereupon plaintiff remitted said sum from the verdict, and the court, May 26, 1906, overruled defendant's motion for a new trial and rendered judgment for the sum of $2,000 and costs. The defendant, in his motion for a new trial, specified grounds for the same, among which are that the verdict is contrary to the evidence and is the result of passion and prejudice on the part of the jury. These grounds are also assigned as error and argued by counsel for defendant. Whether they are well assigned involves consideration of the evidence, which is quite voluminous.

The plaintiff was engaged in business at the place known as number 1039 Milwaukee avenue, in the city of Chicago, in the years 1902, 1903 and 1904, and in the year 1904 the defendant lived at number 1054 Milwaukee avenue, which, he says, was "right across the street, two doors across the street" from plaintiff's place of business. Defendant was a pedler and a customer of plaintiff, who testified that defendant purchased goods from him "once a month or once in two months." Plaintiff's wife assisted in the store, waiting on and selling goods to customers, and she mainly attended to and sold to the defendant. The defendant testified that he commenced buying goods at Miller's store in the fall of 1901; that he purchased from him in that year about $500 worth of goods, and in each succeeding year until 1904, more, and in the first half of 1904, $1,000 worth. It appears from the evidence that about June 9, 1904, the plaintiff's wife filed a bill against him for a divorce, and that a cross-bill was filed by the plaintiff and a decree rendered, but there is no direct evidence as to whom the decree was granted, although it is a legitimate inference from the evidence that the decree was in favor of the plaintiff's wife. The Miller children did not live with their father after the

Sackheim v. Miller.

decree, but were in his wife's custody, and it appears from plaintiff's testimony that after the bill was filed he sought to make a settlement with his wife, and offered property of considerable value if she would return to and live with him.

The plaintiff relies on evidence of the defendant's frequent presence at plaintiff's store and circumstances which the evidence tends to prove transpired there, and on evidence tending to prove that defendant was much in the company of Mrs. Miller at a farm called Hire's farm, near South Haven, in Michigan, in the summer of 1904, which was a sort of summer resort, where Mrs. Miller was with her children. There were eight witnesses for plaintiff, including himself. Plaintiff testified that prior to 1904, defendant came to his store once or twice a week, but in 1904, he was around the store days and nights, until 12 o'clock at night; that he was laying around the woman and reading books and all kinds of things; that plaintiff lived upstairs over the store, and after the store closed, defendant and Mrs. Miller would go upstairs together and play checkers till 12 or 1 o'clock, and that he talked to the defendant about coming so often, and later told him not to come up there, and defendant did not answer him. Plaintiff says that he took sick and was crippled in hands and legs and laid up for *twelve* weeks, five in a hospital, two at home, and then went to Mt. Clemens for four weeks. Asked what he meant by "laying around," he said, "Laying around there and always have conversations with her, speaking to her and telling things to her. I don't know what they were speaking about." He further testified that when he came back from Mt. Clemens he went over to the farm where Mrs. Miller, with her children, were stopping, and where defendant was also stopping. He thus describes what he saw: "Mrs. Miller was sitting on a bench and Mr. Sackheim was laying in the grass right at her legs, like that, next to her. The children were swinging at that time, when I found them, not very far away, about 25 or 30 feet from where Sackheim and Mrs. Miller were, and when they saw me they wanted to run to me. Mr. Goldberg was sitting on the other side of

the bench." Witness further says, referring to Goldberg, "At that time we made a settlement for divorce. He was at one side of Mrs. Miller, laying there, and Mr. Goldberg was on the other side, and Mr. Goldberg offered to settle with her and offered her $500, and she said no, she wouldn't take it." He further testified, "I did not talk with my wife; she ran away and he ran away as soon as they saw me. I spoke with Mr. and Mrs. Goldberg, and they settled for divorce at that time."

The following occurred in the cross-examination of plaintiff:

"Q. Did you ever see Sackheim do anything else except play checkers with your wife?

MR. SHAEFFER (attorney for plaintiff): I object to that question. We have not charged anything improper.

THE COURT: Objection overruled.

MR. GOLDZIER (attorney for defendant): Answer the question.

A. Always friendly together.

Q. They were friendly together? A. They were friendly together.

Q. What do you mean by that? A. Well, I wouldn't say anything bad about her.

Q. Well, did you see anything bad? A. I can't say that."

In reference to the attempted settlement of the divorce suit, witness testified in substance, that he, through Goldberg, offered to give his wife one of two buildings which he owned, the two being worth $30,000, and also to turn over his business to her, in her own name, if she would return to and live with him, which offer she accepted, and plaintiff expected her to come to Chicago in a few days to settle the matter, but she did not come, and Goldberg went to see what the trouble was and found defendant there, and Mrs. Miller said that if plaintiff would give her both houses and the business she would not settle. He also testified that Sackheim came back to Chicago the same day his wife came back, but he did not speak to him till after the decree was

Sackheim v. Miller.

rendered, when he spoke a few words to him, and defendant started to "lick" him.    He does not say what words he spoke to defendant.

Plaintiff also testified that eight years before the hearing his wife left him, and he gave, as a reason for her leaving, that he had sent to his father $100 to aid him.

We have referred to the plaintiff's testimony so largely because it is certainly as strongly in his favor as any other evidence which he produced.    Plaintiff's witnesses as to defendant being at plaintiff's store were three—Morris Spier, Rosalie Spier and Max Allen.    Morris Spier testified that almost every time he used to go to plaintiff's store he saw defendant talking to the girls who used to work for plaintiff, and to Mr. and Mrs. Miller, and that during 1904, as well as he could recollect, he saw him there every other day, and at one time, between 10 and 11 o'clock in the evening, he saw defendant and Mrs. Miller take a Milwaukee avenue car to go down town.    On cross-examination this witness testified: "Some times I passed by every day and sometimes I passed there two or three times a week, and every time I saw him there.    He used to sit right at the door in front of the store."

Max Allen testified, in substance, that he was a large customer of plaintiff, and called at his store on business three or four times a week in the year 1902–3 and 4, and saw defendant there often in 1904, but not often in 1902 and 1903; that, in the latter part of 1903, he went to the store to get some goods which plaintiff had promised him, and they were not ready, and Miller came down and found his wife and defendant talking, and was pretty angry, and scolded Mrs. Miller for not having put up the goods and went upstairs, and defendant said to Mrs. Miller, "I wouldn't care, Mrs. Miller, let him bark like a dirty dog. He is nothing but an ignorant damn fool anyway," and Mrs. Miller said nothing.    "She laid up a few garments for me and I took them away."    On cross-examination the witness said: "When I came in the store I was in the habit of finding him mostly in the rear of the store and

Mrs. Miller sitting next to him, or reading a paper and talking together very friendly."

Rosalie Spier testified that she was in the store next to plaintiff's store and saw defendant at Miller's store nearly every day, two or three times, and once, when plaintiff was in the hospital, between nine and ten o'clock in the evening, she saw defendant and Mrs. Miller go northwest on Milwaukee avenue toward the park. This witness appears to be hostile to defendant. She says he once called her down, called her a false witness.

Three witnesses called by plaintiff testified as to what occurred at Hire's farm, substantially as follows:

Adolph Goldberg, who tried to settle the divorce suit for plaintiff, testified that he went to the farm in July, 1904, shortly before Mrs. Miller and her children came there; that defendant came there about a week afterward, and he and Mrs. Miller were constantly together, and kept out of sight of other people; that he had seen them walking along country roads, and saw them sitting together in the bushes one night close to ten o'clock, when others had retired, when no others were up that he knew of. There were sometimes ten, sometimes thirty people. stopping at the farm house. This occurred in witness' cross-examination:

"Q. Have you ever seen anything improper between Sackheim and Mrs. Miller?"

Mr. Shaeffer: I object to that; it calls for a conclusion of the witness.

Mr. Goldzier: Well, I will withdraw it.

Mr. Shaeffer: My reason for objecting was that I don't care to cast any aspersions on the woman."

Fannie Goldblatt testified that she was at South Haven the latter part of July and the first week in August, and that the defendant and Mrs. Miller were always in each other's company. She says: "I observed nothing else particularly, because I was on the next farm, and I just saw them together and playing lawn tennis together in each other's com-

pany.   I was with them just the first part and my little girl was with me.   Mrs. Miller's children were with her."

Jennie Goldblatt, about 11 years of age at the time of the trial, testified that she saw defendant and Mrs. Miller at the farm where she, witness, was, walking together, hand in hand, swinging their hands.

Defendant, after testifying, as heretofore stated, to the quantities of goods he purchased at plaintiff's store, testified that he did not purchase all the goods in a lump; that he used to give orders on the store to his customers, and they wanted him to wait on them at the store, which he did for certain of them, and this was known to plaintiff and his wife; that this brought him to the store, at the beginning, once, twice or oftener a week, and later, when his business had increased, he had to be there almost every day; that outside of business hours he would be there, waiting for customers, some of whom brought him money, instead of waiting for him to send for it.   When at the store he would sit talking to the salesladies sometimes and to men who used to deal with Mrs. Miller.   He says there were never any improper relations between him and Mrs. Miller, and denies having ever visited her at late hours of the night, and denies ever having played checkers with her in the living rooms of the building, except perhaps once, in plaintiff's presence, and says he never was alone with Mrs. Miller in any of the living rooms.   Defendant further testified that on one occasion, when he and plaintiff were playing checkers, plaintiff became angry with his wife and slapped her, and another time he became angry because she had not fixed the store window to suit him and slapped her, and the day he left home for Mt. Clemens he quarreled with her and struck her with a cane, and that he used to call her vile names, called her a whore and told her to go to hell.   In reference to his being at the Hire farm and what occurred there, defendant testified that he had been there the year before and did not go in 1904 by any arrangement with Mrs. Miller, and that he and others whom he knew in Chicago used to keep together, and that he was not in Mrs. Miller's company more

than in the company of others. He testified that when plaintiff came to the farm he was lying on the grass between Mrs. Miller and Mr. Goldberg, and besides Mr. Goldberg, Mrs. Goldberg and a man named Carroll, several other people and three young ladies were present, when Miller came up, and he, defendant, did not run away, but walked away, when plaintiff walked to Mr. Goldberg and commenced talking with him. Defendant denies walking with Mrs. Miller hand in hand at any time, and denies having ever gone down town with her, and says he did not advise commencing the divorce suit and had nothing to do with bringing about the separation of plaintiff and his wife, and that he never professed affection or love for her, and that there was absolutely nothing between them except their business relations and such friendly relations at the farm as would naturally exist between persons acquainted and from the same town.

Anna Ignowski, a sales lady in plaintiff's store in the years 1903 to 1905, inclusive, testified that she was in the store from 8 o'clock a. m. till 10:30 o'clock p. m., and defendant used to come to the store and buy goods from Mrs. Miller; that he came in the morning and toward evening, and would stay twenty minutes or half an hour at the longest. She further testified: "I never saw Mr. Sackheim and Mrs. Miller sitting together reading. I never seen them do anything there. Sackheim used to buy goods of Mrs. Miller, and she waited on him and wrapped the goods and he went out. Mrs. Miller did not treat him any better than the rest of the pedlers. She treated him the very same way." This witness also testified that plaintiff was awfully cruel to his wife, and called her names which witness said she did not like to repeat, bad names, and at one time he slapped her in the face with a coat because she, having been busy, had not prepared dinner, and at another time he struck her, and when witness remonstrated, threatened to strike her, and on still another occasion he struck his wife with a chair. This witness was not cross-examined.

Bertha Miller, plaintiff's daughter, who was sixteen years and about two months of age when the trial occurred, testi-

Sackheim v. Miller.

fied, in substance: "In 1903 and 1904 I went to school, but used to work and sell goods in the store before 8:30 a. m., at noon, and after 4 p. m. Saw Sackheim there, when he came in with customers to buy goods. He came as often as the other men who came to buy goods. I lived with my father and mother in the rooms above the store. He used to come up there with father and played checkers with father. Never played with mother that I know of. He went away about 9 o'clock. Never knew him to stay till 12 or 1 o'clock, or to stay in the living rooms after father went to bed. Some time in July, 1904, mother and us four children went to Hire's farm. Sackheim was not there when we got there. He came later, how much later I don't know. There was quite a number of people there. When Sackheim came he used to go with all of us, a large company, to the lake. He was not in mother's company any more than the other people that I know of. Know nothing of mother and Sackheim walking hand in hand or arm in arm at any time. She was never out, during that trip, as late as 10 o'clock at night. When she went for a walk in the evening she took all of us. Seven years ago plaintiff slapped mother in the face and bled her nose. That was the time she left him and took me with her. I have seen him slap her and throw dishes at her many times, and have seen her back all black and blue. I have seen him strike her with a book. She left him more than once before. He used to scold her and swear at her. Defendant was not in our living rooms except when father invited him, and I never saw him there later than 9:30 or 9:45 o'clock in the evening."

Morris Miller, plaintiff's son, testified substantially as did Bertha. In reference to the farm he testified: "I saw Sackheim out there. He was there before us. We met him on the road while we were going to the lake. He was not stopping at the same farm at that time. I was with my mother most of the time. My three sisters were also. The youngest was seven years old, the next nine. The defendant was in my mother's company when going to

the lake or going for a walk. Our whole family had one room at the farm. We all went to bed at the same time. I know of no time when my mother was out late at night with Mr. Sackheim at that farm, nor of any time when she was walking hand in hand with him. I saw my father take a chair and strike mother, and when she fell the rocker fell on her. He wanted to strike her again and I wouldn't let him. Her back was hurt and she had to go to bed. I also saw him strike her once when father was playing checkers with Sackheim. I saw him strike her a couple of times a week. After mother filed a bill, she moved to the North Side and we lived there almost a year and a half."

Joseph Sackheim, defendant's brother, testified that he was at the farm eight days while Mrs. Miller and his brother were there, and that they used to go out all together, and he never saw his brother out late with Mrs. Miller, or walking hand in hand with her. Once, when in plaintiff's store, he saw plaintiff strike his wife in the face and she fell on the show case and was hurt. He heard plaintiff call his wife a son of a bitch and other vile names quite a few times.

Julia Arndt, sales lady in plaintiff's store in 1903 and 1904, testified that defendant came to the store often and purchased goods solely from Mrs. Miller, and that she never saw him go upstairs, and that, on one occasion, she saw plaintiff strike his wife.

Plaintiff, called in rebuttal, denied having ever struck his wife, or called her bad names, and said, "I don't know what swearing is, to tell the truth. I don't know what a bad name is."

It will be perceived from the foregoing statement of the evidence that plaintiff's evidence was mainly directed to proving what occurred at plaintiff's store and at Hire's farm in the year 1904. The defendant is a bachelor; he lived a very short distance from plaintiff's store, and had business relations with plaintiff for several years, purchasing quite a large quantity of goods from him, and was well acquainted with plaintiff, his wife, and the salesladies in the store, and, as the evidence shows, was on social terms with the plaintiff.

Sackheim v. Miller.

Under such circumstances, it was not unnatural that defend-
and should be frequently in the store, even at times when he
was not there on business.    There is no evidence that he
ever did or said anything improper at the store, except per-
haps, Allen's testimony that defendant said the plaintiff was
a "damn fool," and it certainly cannot be legitimately in-
ferred from his mere frequent presence there that he was
making love to Mrs. Miller any more than to one of the sales-
ladies, or that he was there for the purpose of alienating, or
that he attempted to alienate, Mrs. Miller's affection from
her husband.    That he was engaged in making love to Mrs.
Miller, or attempting to alienate her affection from plain-
tiff, at the time plaintiff went to the farm, is too absurd for
serious consideration, as at that time Goldberg, his wife
and sister-in-law and other persons were present.    Mr.
Goldberg, evidently a friend of plaintiff, did not testify to
any impropriety on that occasion.

Counsel for defendant contend that the plaintiff's evidence
does not prove a *prima facie* case, one which would war-
rant a verdict in his favor.    Waiving this question, we are
of opinion that the evidence tends much more strongly to
prove that the plaintiff himself, by his conduct toward his
wife, deprived himself of her affection, than it tends to
prove that the defendant alienated her affection from the
plaintiff.    In other words, that the greater weight of the evi-
dence is for the defendant.    The verdict for $6,000 has
no basis in the evidence, and is so grossly excessive, in view
of the evidence, that it cannot be regarded otherwise than
as the result of passion, prejudice or misconception on the
part of the jury.    "The *remittitur* does not remove the
prejudice, passion or misconception.    These elements may
have entered and probably did enter into the finding of
other facts important to the issue, if not the issue itself."
Loewenthal v. Streng, 90 Ill., 74.    Chicago City Ry. Co.
v. Fennimore, 78 Ill. App., 478, 481.

Had the jury not been influenced by passion, prejudice or
misconception, they might have found for the defendant,
and if they had so found, the verdict could not reasonably

be set aside as being contrary to the evidence.  On the trial, defendant's counsel offered in evidence the bill of complaint in case Miller v. Miller, and the cross-bill of the defendant, and the decree in the cause, counsel stating that the cross-bill was, by the decree, dismissed for want of equity, and a decree rendered for Mrs. Miller.  No objection was made by counsel for the plaintiff to the introduction in evidence of any of these documents, but the court, on its own motion, excluded each of them.  They are not contained in the record, and counsel for plaintiff contend that the documents not being before us, we cannot review the action of the court in excluding them, citing Ittner Brick Co. v. Ashby, 198 Ill., 562, McLeod v. Andrews *et al.*, 116 Ill. App., 646.  In the former case it was contended by the appellant that the court erred in sustaining an objection to a question put to a witness; but no statement was made by counsel of what was expected to be proved by the witness, nor did it otherwise appear, and the court said:  "What appellant claims the answer would be must be made to appear before it can be determined that it was prejudicial error to exclude the answer."  198 Ill., p. 565.

In McLeod v. Andrews *et al.*, the decision of the Appellate Court was substantially the same as in the first mentioned case.  We do not regard either case as applicable in this case.  The statements made to the court by defendant's counsel informed the court that the bill was by Mrs. Miller for a divorce, and that a divorce was granted to her, and plaintiff's cross-bill was dismissed for want of equity.  It was not stated what the bill charged, but inasmuch as a decree was granted on it in her favor, it must be presumed to have been for a statutory cause for divorce.  The issue was, whether or not the defendant alienated the love and affection of plaintiff's wife.  Evidence of any one of the statutory causes for divorce would tend to prove that the love and affection of plaintiff's wife were alienated by the cause for divorce averred in the bill and found as a fact by the decree.  We are of opinion that the offered evidence should have been admitted.

Counsel for defendant object that plaintiff's counsel, in argument to the jury, made improper remarks prejudicial to the defendant; but it does not appear from the record that any of the remarks were objected to on the trial except in a single instance, and no rulings of the court were asked for or made.    Therefore we cannot consider this objection.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*